**UNITED STATES, Appellee,**

v.

**Joel E. AUSTIN, Private First Class, U.S. Army, Appellant.**

No. 56,023.
SPCM 21648.

U.S. Court of Military Appeals.

Oct. 25, 1988.

For Appellant: *Captain Jon W. Stentz* (argued); *Colonel John T. Edwards, Cap-*

tain Lorraine Lee, Captain Keith W. Sickendick (on brief); Colonel Brooks B. LaGrua, Lieutenant Colonel Paul J. Luedtke, Major Eric T. Frazen.

For Appellee: Captain Gary L. Hausken (argued); Colonel Norman G. Cooper and Lieutenant Colonel Gary F. Roberson (on brief); Captain Vito A. Clementi and Captain Samuel J. Rob.

## OPINION OF THE COURT

SULLIVAN, Judge:

On May 15, 1985, appellant was tried before a military judge sitting alone at a special court-martial at Fort Lewis, Washington. Contrary to his pleas, he was found guilty of willfully disobeying a lawful order of a superior commissioned officer on two occasions in violation of Article 90, Uniform Code of Military Justice, 10 U.S.C. § 890. Appellant was sentenced to a bad-conduct discharge and forfeiture of $200.00 pay per month for 3 months. The convening authority approved the sentence. The Court of Military Review initially affirmed the findings and the sentence on July 29, 1986. Following remand by this Court, 23 M.J. 257, it again affirmed on February 24, 1987.

We granted this petition to review the following issue raised by appellate defense counsel:

WHETHER ORDERS TO APPELLANT TO DRAW HIS WEAPON WERE ILLEGAL BECAUSE THEY WERE IN CONTRAVENTION OF THE DUTY LIMITATIONS OF PARAGRAPH 2–10a, ARMY REGULATION 600–43.

We hold that there was sufficient evidence in this record from which the military judge could find as a matter of fact that the challenged orders did not violate this service regulation. See generally United

States v. Stewart, 20 USCMA 272, 276 n. 1, 43 CMR 112, 116 n. 1 (1979).

The evidence of record[1] shows that on January 6, 1984, appellant filed an application for conscientious-objector status under Army Regulation (AR) 600–43 (Aug. 1, 1983). His DA Form 4187 request for personnel action (to be discharged on this basis) was later submitted on March 21, 1984. Appellant's company commander, Captain Klapakis, recommended approval of this request on June 25, 1984.

An investigation required under AR 600–43 was conducted and eventually completed on September 5, 1984. The investigating officer filed his findings together with his recommendation for approval. The battalion and brigade commanders, the staff judge advocate, and the acting general court-martial convening authority, however, all recommended disapproval. On December 21, 1984, the Department of the Army Conscientious Objector Review Board disapproved appellant's request. The disapproval of this application was subsequently communicated to appellant by Captain Walton, his new company commander.

On February 20, 1985, Captain Walton told appellant that he would be required to qualify with his weapon on February 25, 1985. On the latter date, appellant submitted to Captain Walton a second application requesting conscientious-objector status. He informed appellant that the application did not contain a required DA Form 4187. Captain Walton then ordered appellant to qualify with his weapon on the rifle range. Appellant respectfully refused and stated that he could not comply as a matter of conscience. A few days later Captain Walton received the required DA Form 4187.

---

1. Trial defense counsel offered certified copies of the two application packages to the military judge during the hearing on the Government's pretrial motion to limit the number of defense witnesses. Moreover, he clearly indicated that legality of the orders was the central point of the defense, and the application packets were critical considerations in this regard. Finally,

all the parties to this appeal have treated these application packages denominated appellate exhibits as part of the record of trial. We see no contravention of Article 67(b), Uniform Code of Military Justice, 10 U.S.C. § 867(b), in this context. See United States v. Bethea, 22 USCMA 223, 46 CMR 223 (1973).

In reviewing the second conscientious-objector application, Captain Walton found it "was substantially the same" as the first application.[2] He testified that he came to this decision on February 25, 1985, and stated his finding in a memorandum for the record dated February 26, 1985. He officially forwarded this memorandum with appellant's conscientious-objector application on March 4, 1985. However, Captain Walton testified that, prior to his order, he did not inform appellant of his finding of substantial similarity or that this finding precluded appellant from assuming a limited duty status that would exempt him from firing a weapon.

Lieutenant Colonel Cima, appellant's battalion commander, testified that he discussed the second application with appellant and informed appellant that there was substantially nothing new in the packet he had submitted. The date of this discussion was not expressly stated in the record. However, it is established that the colonel disapproved the second application on March 11, 1985.

On March 18, 1985, Captain Walton again ordered appellant to draw his weapon. Appellant refused and stated he could not comply as a matter of conscience. On April 5, 1985, appellant was charged with two specifications of disobeying the order of a superior commissioned officer. On April 17, 1985, appellant's second applica-

tion was returned without action by the general court-martial convening authority. That officer stated that "his application is based on substantially the same grounds as his original submission, which was denied by" Headquarters, Department of the Army "on 21 December 84."

∎ . ∎ . ∎ . ∎ . ∎

■ Article 90 states *inter alia* that "[a]ny person subject to this chapter who... willfully disobeys a lawful command of his superior commissioned officer shall be punished... as a court-martial may direct." The granted issue generally questions the lawfulness of the commands given to appellant in the present case. Para. 14c(2)(a), Part IV, Manual for Courts-Martial, United States, 1984. *See generally* W. Winthrop, *Military Law and Precedents* 575–77 (2d ed. 1920 Reprint); G. Davis, *A Treatise on the Military Law of the United States* 380–82 (1913). It particularly asks whether Captain Walton's orders to appellant to draw his weapon violated the duty limitations for conscientious-objector applicants found in paragraph 2–10a, AR 600–43. *See United States v. Lenox*, 21 USCMA 314, 45 CMR 88 (1972); *United States v. Stewart, supra; United States v. Noyd*, 18 USCMA 483, 40 CMR 195 (1969).

Paragraph 2–10a states:

2–10. Use, assignment, and training. *a. Except as provided in b below, persons*

---

**2.** 2–9. Second and later applications. *a.* An application for discharge as a conscientious objector (1–0) or for classification (1–A–O) that has been considered and disapproved by HQDA will not be reconsidered. *However, an applicant may submit second and later formal applications to his or her unit commander.* These applications will be considered *only* if
(1) They are not based upon substantially the same grounds, or
(2) They are not supported by substantially the same evidence, as a previously disapproved application.
*b.* When a second or later formal application is received, the unit commander will forward the application and any documents submitted with it to the headquarters of the GCMCA specified in paragraph 2–8a. At this headquarters the SJA will review the application to determine whether it is substantially the same as a previous application disapproved by HQDA. After the legal review and

opinion, the approval authorities specified in paragraph 2–8a are authorized to return to a person, without action, any second or later application under this regulation when review reveals that it is substantially the same as a previous application disapproved by HQDA.
*c.* If the GCMCA specified in paragraph 2–8a, by means of the legal review and opinion, determines that the second or later application is not substantially the same as a previously disapproved application, the GCMCA will return the application to the person's unit commander to process according to this regulation. A new chaplain's report of interview and mental status evaluation or a psychiatric evaluation, and a new investigating officer's report also is required.
*d.* If the final decision to approve or disapprove is not authorized to be made at the GCMCA level, the application will be forwarded to HQDA (see para 2–8c) for final action. (Emphasis added.)

*who have submitted applications (see para 2–1) will be retained in their unit and assigned duties providing minimum practicable conflict with their asserted beliefs, pending a final decision on their applications.* Reassignment orders received after the submission of an application will be delayed until the approval authority makes a final determination. In the case of trainees, they will not be required to train in the study, use, or handling of arms or weapons. The trainee is not precluded from taking part in those aspects of training that do not involve the bearing or use of arms, weapons, or munitions. Except for this restriction, conscientious objector applicants are subject to all military orders and discipline, and regulations to include those on training.

(Emphasis added.) However, paragraph 2–10*b* states:

b. *In the case of second and later applications, the duty limitations of a above will not apply if the applicant's immediate commander determines that the application is substantially the same as a previously disapproved application.* However, the provisions of paragraph 2–9 still apply. [*See* n.2, *supra.*]

Finally, paragraph 2–1*a* states:

2–1. Application. *a.* Military personnel who seek either discharge or assignment to noncombatant duties because of conscientious objection *will submit an application on DA Form 4187 (Personnel Action) to their immediate commanding officer.* Personnel will indicate whether they are seeking discharge or assignment to noncombatant duties. Ap-

plications must also include all of the personal information required by appendix B, and any other information personnel desire to submit. *Completion of the foregoing constitutes a formal application.* Personnel will date and sign the DA Form 4187 and each inclosure. Non-unit members (Individual Ready Reserve and Standy Reserve) will submit their applications to the oversea area commander or Commander (Cdr), US Army Reserve Components Personnel and Administration Center (RCPAC), 9700 Page Boulevard, St. Louis, MO 63132, as appropriate. Applications from recruits will not be submitted to or accepted by MEPCOM or reception stations. For this regulation, the bt [basic training] company is considered to be the first duty station for a recruit applying under this regulation.

(Emphasis added.) In resolving the granted issue, all these regulatory provisions must be applied to the facts of this case.

We agree with the Government that the duty limitations of paragraph 2–10*a* were shown to be inapplicable to appellant. The evidence of record supports a finding of fact that appellant failed to submit a completed formal application as required by paragraphs 2–1*a* and 2–9*b*. It also shows that he was advised of this fact prior to receiving his order on February 25, 1985. *See* para. 2.2*d*. [3] Therefore, a second application within the meaning of paragraph 2–10*b* was not properly submitted in this case, and the denial of the first application stands by itself. Accordingly, the controlling regulatory provision at the time of the first order was paragraph 2–10*d* [4], and no duty limitation conflicting with Captain

---

**3.** Paragraph 2–2*d* states:
    *d.* During the processing of the application, substantial delay may be incurred by the person's failure to meet appointments, submit statements, etc. *If so, the commander will inform the person that such delay prevents the Army from taking action on the request and may contribute to an unfavorable decision when the cause of the delay indicates insincerity on the part of the applicant.* Any delay caused by the applicant exceeding 15 days should be made a matter of record.

(Emphasis added.)

**4.** Paragraph 2–10*d* states:
    *d.* When a request for conscientious objector status has been denied, the person—
    (1) Will comply with reassignment orders, and
    (2) May be assigned to any duties, or
    (3) May be required to participate in any type of training.

Walton's order existed. *See also* 32 C.F.R. 75.7(c).

■ In any event, the military judge made clear prior to his findings that he would consider defenses to these charges based on the above regulation. In this regard, there was testimony from Captain Walton that he had found appellant's second application for conscientious-objector status was substantially the same as his earlier application, and he had done so prior to his order on February 25, 1985. Appellant concedes as much in his final brief. Accordingly, assuming a proper application was submitted, a sufficient basis existed in the record to factually find that paragraph 2–10*b* was not violated by these orders.

Appellant, nonetheless, contends that the prosecution did not show as a matter of fact that he knew that he had a duty to obey these orders. On the contrary, he asserts that there was evidence that he did not know Captain Walton had made a paragraph 2–10*b* determination against him prior to his disobedience of these orders. Accordingly, he argues that it was a complete defense to these charges that he may have mistakenly believed the order of Captain Walton was unlawful as a violation of service regulations. *See generally United States v. Pendergrass*, 17 USCMA 391, 393, 38 CMR 189, 191 (1968).

■ Initially, we note that the regulation does not expressly require that notice of a substantial-sameness determination be given by the local commander. *See* para. 2–9; *cf.* para. 2–6*e*. [5] Moreover, Article 90 does not expressly require that the prosecution prove that the accused knew that the or-

ders allegedly violated were lawful. However, Article 90 does require that the disobedience which it proscribes be willful. Such disobedience consists of "an intentional defiance of [military] authority" (*see* para. 14c(2)(f), Part IV, Manual, *supra* ). It is in this light that appellant implies that the prosecution was required either to prove that appellant knew he had a duty to obey the order or disprove a mistake of law or fact on his part. *See United States v. Simmons*, 1 USCMA 691, 694, 5 CMR 119, 122 (1952).

In *Simmons*, this Court illustrated, by means of a hypothetical situation, that there are circumstances where a person could not be found guilty of violating a superior officer's lawful order because of a certain lack of knowledge on the part of the accused:

> There can be a knowing or willful disobedience of an order without there being knowledge that the person issuing the order is a superior officer. The point we desire to make may be brought into bold relief by the use of an illustration. *If we assume combat conditions and that officers are not wearing insignia, a superior officer may issue an order, an enlisted man could willfully and knowingly refuse to obey, and, yet not be guilty of the offense because he was not apprised of the fact that the person giving the order was an officer.*

(Emphasis added.) However, knowledge of the status of the person giving the order is not the same as knowledge that the order is lawful. *See* para. 14c(2)(e). "It is a...long-standing principle of military law that" an order from a known superior is

---

5. Paragraph 2–6*e* states:
    *e.* The case may be returned to the investigating officer if further investigation is deemed necessary; however, all original documents will remain in the case record. New or revised documents may be added to the case record but not substituted for the originals. At the conclusion of an additional investigation, a new recommendation may be made, if appropriate, if new information adverse to the person is added to the record, or

if a new recommendation is made, it will be forwarded to the applicant for rebuttal. The person will execute a new rebuttal form (fig 2–6) at this time. The case record, with the new material added, will be forwarded through command channels to the headquarters that initiated the request for further investigation.
In context this provision applies to action at the general court-martial authority level.

presumed to be lawful unless "palpably illegal on its face." *United States v. Trani,* 1 USCMA 293, 296–97, 3 CMR 27, 30–31 (1952). *See* para. 14c(2)(a)(i). *See generally* N. Keijzer, *Military Obedience* 97–98, 155–171 (1978) and cases cited therein; *United States v. Wahl,* 4 CMR 767, 775–78 (AFBR), *pet. denied,* 2 USCMA 662, 4 CMR 173 (1952). Accordingly, personal notions or beliefs as to the legality of the order are not relevant. *See United States v. Johnson,* 17 USCMA 246, 247, 38 CMR 44, 45 (1967).

Turning to appellant's factual contentions, we note that on February 25, he handed in his second application and shortly thereafter was given the order to draw his weapon. Admittedly, Captain Walton failed to expressly inform appellant of his regulatory determination of substantial sameness. However, clearly the substance of his decision on the second application was impliedly communicated to appellant. There was ample evidence that appellant knew Captain Walton was his superior officer; that he was aware that this officer was attempting to process his application in accordance with service regulations; and that he recognized that Captain Walton was now addressing the order to him. Moreover, the record of trial contains no evidence suggesting that Captain Walton failed to otherwise comply with his regulatory responsibilities, or that his orders were otherwise illegal, or, for that matter, that his failure to expressly inform appellant of his determination had any impact on appellant's decision to disobey.[6] Accordingly, this is sufficient evidence that appellant willfully *and* knowingly disobeyed a lawful order of his superior officer and the finding of guilty of specification 1 must stand.[7]

■ Turning to the second specification, we note that Lieutenant Colonel Cima testified that "as a matter of course when a personnel action comes across the desk I had him in to discuss the issue." He further testified that he would discuss his recommendation of "disapproval" and on the first application, "[w]e went through each endorsement all the way up the line." Finally, Lieutenant Colonel Cima stated that he discussed his reason for disapproval of the second application with appellant. In view of the date of this action, March 11, 1985, an inference could be drawn from the above that Lieutenant Colonel Cima also discussed with him Captain Walton's negative action on this same application prior to his second order on March 18, 1985. This is sufficient evidence which could sustain this finding of guilty of a willful and knowing violation of Article 90 beyond a reasonable doubt. See *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

6. Orders must be just and fair. At the heart of the operation of any army is the obedience of military orders. A soldier must obey his superior's lawful orders. The superior, in giving those orders, however, bears a great responsibility to communicate the orders in a fair and clear manner. "Poor leadership, however, provides no legal justification to disregard a lawful order." *United States v. Stevenson,* 21 USCMA 426, 427, 45 CMR 200, 201 (1972); W. Winthrop, *Military Law and Precedents* 576 (2d ed. 1920 Reprint).

7. Many years ago, General Schofield observed: The best and most successful commanders of all grades are those who win the respect, confidence and affection of their subordinates by justice and firmness tempered by kindness. The discipline which makes the soldiers of a free country reliable in battle is not to be gained by harsh or tyrannical treatment. On the contrary, such treatment is far more likely to destroy than to make an army. It is possible to impart instruction and give commands in such manner and in such tone of voice as to inspire in the soldier no feeling but an intense desire to obey. While the opposite manner and tone of voice cannot fail to excite strong resentment and a desire to disobey. The one mode or the other of dealing with subordinates springs from a corresponding spirit in the breast of the commander. He who feels the respect which is due to others cannot fail to inspire in them regard for himself. While he who feels, and hence manifests, disrespect toward others, especially his inferiors, cannot fail to inspire hatred against himself.
Address at West Point, August 11, 1879 (Library, United States Military Academy).

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge EVERETT concurs.

COX, Judge (concurring with reservations):

Although I generally concur with the majority opinion, I write separately to make it clear that, to me, the record of trial in this case does not suggest that appellant's officers may have exhibited poor leadership qualities. If footnote 6 of the majority opinion implies such, then I respectfully disagree.